NO. 12-02-00150-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


THE STATE OF TEXAS
§
 APPEAL FROM THE 



FOR THE BEST INTEREST
§
 COUNTY COURT AT LAW



AND PROTECTION OF E.M.
§
 CHEROKEE COUNTY, TEXAS

 

 Appellant E.M. ("E.M.") appeals from the trial court's order committing him to the Austin
State Hospital for a period not to exceed ninety days pursuant to section 574.034 of the Texas Health
and Safety Code. (1) In one issue, E.M. challenges the legal and factual sufficiency of the State's
evidence to support the order of commitment. We affirm.


Background

 On May 13, 2002, Steve Peters filed an "Application for Court Ordered Temporary Mental
Health Services" ("application") with the County Clerk of Cherokee County, Texas. The application
stated that E.M. was mentally ill and that he met the criteria set forth in section 574.034 of the Texas
Health and Safety Code. At the time Peters filed the application, E.M. was serving a one year
sentence for possession of cocaine at the Skyview Unit of the Texas Department of Criminal Justice-Institutional Division. He had recently been transferred to the Skyview Unit from the Jester IV unit
for evaluation and possible commitment to a state hospital. E.M. was scheduled to be released from
prison on May 27.

 The hearing on the application was held on May 15, 2002. At the end of the hearing, the trial
court found that E.M. was mentally ill and as a result of that mental illness was likely to cause
serious harm to himself or "will, if not treated, continue to suffer severe and abnormal mental,
emotional or physical distress and will continue to experience deterioration of his ability to function
independently and is unable to make a rational and informed decision as to whether or not to submit
to treatment." See Tex. Health & Safety Code Ann. § 574.034(a) (Vernon Supp. 2002). As a
result of the trial court's findings, E.M. was ordered committed to the Austin State Hospital for in-patient care for a period not to exceed ninety days.

 

Burden of Proof and Standard of Review 

 Section 574.034 of the Texas Health and Safety Code contains the criteria for court-ordered
temporary inpatient mental health services. The court may order a proposed patient to receive
temporary inpatient mental health services only if the factfinder concludes from clear and convincing
evidence that the proposed patient is mentally ill and also meets at least one of the additional criteria
set forth in section 574.034(a)(2). Specifically, subsection (a)(2) provides that the factfinder must
conclude that as a result of mental illness, the proposed patient



 is likely to cause harm to himself;


 


 is likely to cause serious harm to others; or



 

 is:



 (i) suffering severe and abnormal mental, emotional, or physical
distress;


 (ii) experiencing substantial mental or physical deterioration of the
proposed patient's ability to function independently, which is
exhibited by the proposed patient's inability, except for reasons
of indigence, to provide for the proposed patient's basic needs,
including food, clothing, health, or safety; and


 (iii) unable to make a rational and informed decision as to whether or
not to submit to treatment.



Tex. Health & Safety Code Ann. § 574.034(a)(2).

 The State has the burden of establishing by clear and convincing evidence that the proposed
patient meets at least one of the additional criteria listed in section 574.034(a)(2). Mezick v. State,
920 S.W.2d 427, 430 (Tex. App.-Houston [1st Dist.] 1996, no writ). "Clear and convincing
evidence" is an intermediate standard, falling between the preponderance of the evidence standard
of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. State v.
Addington, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam). The Texas Supreme Court has defined
"clear and convincing evidence" as "that degree of proof which will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought to be established." 
Addington, 588 S.W.2d at 570. When court-ordered temporary mental health services are sought,
an additional requirement for clear and convincing evidence is imposed. To be clear and convincing
under subsection (a), the evidence must include expert testimony and, unless waived, evidence of
a recent overt act or a continuing pattern of behavior that tends to confirm



 the likelihood of serious harm to the proposed patient or others; or



 (2) the proposed patient's distress and the deterioration of the proposed patient's ability
to function.


Tex. Health & Safety Code Ann. § 574.034(d) (Vernon Supp. 2002). The clear and convincing
standard does not alter the appropriate standard of review. In re Caballero, 53 S.W.3d 391, 395
(Tex. App.-Amarillo 2001, pet. denied). 

 In reviewing a legal sufficiency or no evidence complaint, the appellate court must consider
only the evidence and inferences that tend to support the challenged findings and disregard all
evidence and inferences to the contrary. Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84
(Tex. 1992). If there is more than a scintilla of evidence to support the findings, the no evidence
challenge fails. Id. 

 When conducting a factual sufficiency review, this court must consider all of the evidence,
including any evidence contrary to the verdict. Plas-Tex. Inc. v. U.S. Steel Corp., 772 S.W.2d 442,
445 (Tex. 1989). In the context of the State's heightened burden of proof in a temporary
commitment case, we review the record to determine whether the trial court could reasonably find
the fact was highly probable. Johnstone v. State, 961 S.W.2d 385, 388 (Tex. App.- Houston [1st
Dist.] 1997, no writ). Under this standard, a challenge to the sufficiency of the evidence will be
sustained if the evidence is insufficient to produce in the mind of the factfinder a firm belief or
conviction as to the truth of the facts, and will be overruled only if the factfinder could have
reasonably found the fact was established by clear and convincing evidence. Id. Findings of fact
are the exclusive province of the factfinder. Bellefonte Underwriters Ins. Co. v. Brown, 704
S.W.2d 742, 744 (Tex. 1986). This court is not a factfinder and may not pass on the credibility of
the witnesses or substitute its judgment for that of the trier of fact, even if a different answer could
be reached on the evidence. See Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988); Clancy v.
Zale Corp., 705 S.W.2d 820, 826 (Tex. App.-Dallas 1986, writ ref'd n.r.e.).


The Evidence

 At the beginning of the hearing, E.M.'s attorney stipulated that the State's testifying expert,
Dr. Wanda Michaels, who was a doctor at the Skyview Unit, was an expert in the field of mental
health care. E.M.'s attorney also stipulated that the "Physician's Certificate[s] of Medical
Examination for Mental Illness" ("certificates"), the recommendations of the treatment team, and
medical records of the Texas Department of Criminal Justice-Institutional Division pertaining to
E.M. were business records, but conditioned the stipulation on his right to assert objections to those
documents on the bases of "privilege, prejudice, and personal knowledge." The certificates were
prepared by Dr. Michaels and Dr. Troy Caldwell, another doctor who examined E.M. at the Skyview
Unit. Dr. Michaels's certificate reflects that she examined E.M. on May 8, 2002 and that during the
examination, E.M. told her that he saw ghosts, that he was the "Dukes of Hazzard" and the "Six
Million Dollar Man." She also noted that on April 28, he told a nurse to suck his penis. Dr.
Michaels's certificate also shows that E.M. was "easily distracted," "made sexually inappropriate
gestures [while] looking at [the] doctor's chest and raised eyebrows talking to self," and had
disorganized thought processes. The certificate further states that on March 29, E.M. was involved
in a fight with another offender and on April 28, he was "caught passing his Cogentin to another
inmate and when counseled about it he shook his penis at the nurse." Based upon Dr. Michaels'
examination of E.M., she diagnosed him as suffering from "schizoaffective disorder, bipolar type"
and "polysubstance dependence in sustained remission in a controlled environment."

 Dr. Caldwell's certificate stated that he examined E.M. on May 13, and that his diagnosis of
E.M.'s condition was "schizoaffective disorder, bipolar type." Dr. Caldwell also noted that E.M.
informed him that he "threw a bicycle on someone in the free world and killed him," that "venom
from snake blood is good when you drink it," and that E.M. could not answer simple questions about
his illness or symptoms. Dr. Caldwell's certificate further states that E.M. made irrelevant
statements in an extended way to Dr. Caldwell's statements or questions and that E.M. "[e]laborates
many irrelevant statements with loose associations such as: horse pill, horse meat is good for you,
John Riggers eats like a horse, etc." 

 The trial court admitted the certificates into evidence, and the State called Dr. Michaels to
testify about E.M.'s mental health. Dr. Michaels testified that she examined E.M. on May 8, 2002
and diagnosed him as suffering from schizoaffective disorder, bipolar type. Dr. Michaels also opined
that E.M. was likely to cause serious harm to others, and was suffering severe mental, emotional, or
physical distress. She reached this opinion based on the fact that E.M. was recently involved in a
fight with another offender in the Jester IV unit before he was transferred to the Skyview Unit. Dr.
Michaels testified that she was concerned that E.M. might continue to have further episodes of
violence in the "free world" because of his pattern of disciplinary problems. She also noted that her
examination of E.M. revealed that he was continuing to have very disorganized thought processes
and was unable to carry on a logical conversation with her. Based upon Dr. Michaels' examination,
she concluded that E.M. was mentally ill and felt that court ordered temporary mental health services
would be the least restrictive appropriate setting available to E.M.

 On cross-examination, Dr. Michaels admitted that she had seen E.M. only two times, for
thirty minutes in the first session and fifteen minutes in the second session. She also admitted that
someone who is involved in fights and someone who sees ghosts should not always be committed
for mental health treatment. E.M.'s counsel then questioned Dr. Michaels about the notes she took
during her examination of E.M. (2) Dr. Michaels testified that E.M. was "progressing well on current
medication, not experiencing A-V hallucinations," "participated in group activities," and "was alert
with group participation." Dr. Michaels also read from a psychiatric evaluation of E.M. performed
on May 7 by A.B. Meharry ("Meharry"), a nurse practitioner at the Skyview Unit. (3) In the evaluation,
Meharry noted that "at this time, I see no evidence of suicidal ideations or intent, nor is there a recent
past history to indicate he would be at high risk in engaging in self-injurious behavior."

 Dr. Michaels further testified that E.M. was able to feed, dress, and utilize personal hygiene
without assistance or prompting, but was not able to initiate conversation in a meaningful way. She
also thought that E.M would not be able to live safely in freedom by himself or with the help of
family members or friends, and that if E.M. was compliant with his medications, he would need
treatment for as little as four weeks or less.

 The State rested, and E.M.'s counsel called E.M. to testify on his own behalf. E.M. testified
that he "really wanted to go home," "was not a harm to others or a harm to himself," did not have
"any intent to harm anyone else," and would live at his mother's house if he was released. He further
testified that he would go to the local MHMR clinic to receive treatment and medicine and that his
mother would help him in doing that. He also told the court, in regards to the recent fight, that "even
though the fight broke out, I would still want peace" and that "they started the fight by giving me
coffee and snorting Cogentin on the table." 

 At the conclusion of the hearing, the trial court found that E.M. "probably needs additional
treatment" and signed the order committing E.M. to the Austin State Hospital for a period of time
not to exceed ninety days.


Legal Sufficiency of the Evidence

 The evidentiary standards for involuntary commitment are high. Harris v. State, 615 S.W.2d
330, 333 (Tex. Civ. App.-Fort Worth 1981, writ ref'd n.r.e.). The State must produce expert
testimony to support its contention that involuntary commitment is necessary. Tex. Health &
Safety Code Ann. § 574.034(d) (Vernon Supp. 2002). However, an expert diagnosis, without
more, is not sufficient to confine a patient for compulsory treatment. Mezick, 920 S.W.2d at 430. 
The State cannot meet its burden of proof without presenting evidence of the behavior of the
proposed patient that provides the factual basis for the expert opinion. Id. To be clear and
convincing, the evidence must show a recent overt act or a continuing pattern of behavior that tends
to confirm the likelihood that the patient will seriously harm himself or others or that his ability to
function is deteriorating because of his distress. Tex. Health & Safety Code Ann. § 574.034(d)
(Vernon Supp. 2002). The recent overt act or continuing pattern of behavior shown by the State
must also relate to the criterion on which the judgment is based. See T.G. v. State, 7 S.W.3d 248,
252 (Tex. App.-Dallas 1999, no pet.); In re Breeden, 4 S.W.3d at 788. 

 In the case at hand, the trial court found that E.M. was mentally ill and as a result of that
mental illness is likely to cause serious harm to himself or "will, if not treated, continue to suffer
severe and abnormal mental, emotional or physical distress and will continue to experience
deterioration of his ability to function independently and is unable to make a rational and informed
decision as to whether or not to submit to treatment." See Tex. Health & Safety Code Ann. §
574.034(a).

 The State's only witness, Dr. Michaels, testified that E.M. was likely to cause harm to others
and based this opinion on the fact that E.M. had recently been involved in a fight with another
offender. The State argues that this fight is the recent overt act by E.M., which the State must
establish in order to meet its "clear and convincing" standard of proving that E.M. is likely to harm
others. Dr. Michaels was also concerned because E.M. was continuing to have very disorganized
thought processes and was unable to have a logical conversation with her. Her notes also reflect that
E.M. made "sexually inappropriate gestures," that he "saw ghosts" and that he thought he was the
"Dukes of Hazzard" and the "Six Million Dollar Man." 

 There is evidence in the record to support Dr. Michaels' assertion that E.M. has a "pattern
of disciplinary cases." On different, recent occasions, telling a nurse to suck his penis, making
sexually inappropriate gestures while looking at the female doctor's chest, fighting with another
offender, passing his medication to another inmate and shaking his penis at a nurse supplies the
scintilla of evidence the law requires. We also agree that the recent fight with another inmate
satisfies the requirement for a scintilla of evidence of a recent overt act. The foregoing evidence
further supports the State's assertion that E.M. has a continuing pattern of behavior that demonstrates
his mental, physical, or emotional distress, deterioration of independent functioning, or inability to
make a rational and informed decision as to whether or not to submit to treatment. 

 To meet the evidentiary standard for a temporary commitment, the evidence offered at the
hearing must show that hospitalization is necessary for the protection and welfare of the proposed
patient or the protection of others. State of Texas for the Best Interest and Protection of C.O., 65
S.W.3d 175, 182 (Tex. App.- Tyler 2001, no pet.). Though there is no evidence of an intent or an
intentional act by E.M. to hurt himself, there is more than a scintilla of evidence to show a
continuing pattern of behavior that demonstrates E.M.'s ability to function was deteriorating because
of his mental distress. E.M.'s sole issue, as it relates to the legal sufficiency of the evidence, is
overruled.


Factual Sufficiency of the Evidence

 E.M.'s challenge to the factual sufficiency of the evidence will prevail if we find that, after
taking all of the evidence into account, the evidence is insufficient to produce in the mind of the
factfinder a firm belief or conviction as to the truth of the facts. Johnstone, 961 S.W.2d at 388. 

 The evidence contrary to the trial court's findings was presented during the cross-examination of Dr. Michaels. On cross-examination, Dr. Michaels admitted that she had seen E.M.
only two times, for thirty minutes in the first session and fifteen minutes in the second session. She
also admitted that someone who is involved in fights and someone who sees ghosts should not
always be committed for mental health treatment. E.M.'s counsel then questioned Dr. Michaels
about the notes she took during her examination of E.M. Dr. Michaels testified that E.M. was
"progressing well on current medication, not experiencing A-V hallucinations," "participated in
group activities," and "was alert with group participation." She also read from Meharry's psychiatric
evaluation of E.M., which state that after Meharry evaluated E.M.'s mental condition, she did not
believe that E.M. would injure himself or commit suicide. Dr. Michaels further testified that E.M.
was able to feed, dress, and utilize personal hygiene without assistance or prompting, but was not
able to initiate conversation in a meaningful way. She also thought that E.M would not be able to
live safely in freedom by himself or with the help of family members or friends, and that if E.M. was
compliant with his medications, he would need treatment for as little as four weeks or less.

 E.M. testified that he "really wanted to go home," "was not a harm to others or a harm to
himself," did not have "any intent to harm anyone else," and would live at his mother's house if he
was released. He further testified that he would receive treatment and medicine and that his mother
would help him in doing that. He also told the court, in regards to the recent fight, that "even though
the fight broke out, I would still want peace" and that "they started the fight by giving me coffee and
snorting Cogentin on the table." 

 After reviewing all of the evidence, both in support of and contrary to the trial court's
findings, we hold that the trial court could have reasonably found that E.M. had a continuing pattern
of behavior that demonstrated his mental distress and deterioration of independent functioning. The
sexually inappropriate gestures, fighting, hallucinations and disorganized thought processes
attributed to E.M. support the trial court's finding that E.M.'s pattern of behavior meets the statutory
requirement for clear and convincing evidence. Although Dr. Michaels' and Meharry's notes show
that E.M. was capable of functioning well within a group, could feed himself and use proper personal
hygiene, this evidence does not convince us that the trial court was unreasonable in finding that
E.M.'s pattern of behavior was the type of pattern necessary to support a temporary commitment. 
E.M.'s first issue, as it relates to the factual sufficiency of the evidence, is overruled.

 The judgment of the trial court is affirmed.



 LOUIS B. GOHMERT, JR. 

 Chief Justice



Opinion delivered November 27, in the Year of our Lord 2002.

Panel consisted of Gohmert, Jr., C.J., Worthen, J., and Griffith, J.






(DO NOT PUBLISH)
1. Although the ninety-day commitment period has expired, this appeal is not moot. In State v. Lodge, 608
S.W.2d 910, 911 (Tex. 1980) the Texas Supreme Court held that the doctrine of mootness does not apply to appeals
from involuntary commitments. 
2. The notes that Dr. Michaels took during her examination of E.M. were not included in either the Clerk's
Record or the Reporter's Record. 
3. Meharry's psychiatric evaluation of E.M. was also not included in either the Clerk's Record or the
Reporter's Record.